**STATE of Minnesota, Appellant,**

v.

**Kathryn Lorraine STREIFF, Respondent.**

No. C8–02–1857.

Supreme Court of Minnesota.

Jan. 29, 2004.

---

Mike Hatch, Attorney General, St. Paul, MN; and Raymond F. Schmitz, Olmsted County Attorney, Rochester, MN, Helen R. Brosnahan, Special Assistant Olmsted County Attorney, Dakota County Judicial Center, Hastings, MN, for Appellant.

Duane A. Kennedy, Rochester, MN, for Respondent.

## OPINION

HANSON, Justice.

Respondent Kathryn L. Streiff (Streiff) was charged with two felonies, criminal vehicular operation resulting in substantial

bodily harm under Minn.Stat. § 609.21, subd. 2a(4) (2002), and criminal vehicular operation leaving the scene of the crime under Minn.Stat. § 609.21, subd. 2a(7) (2002). Over the prosecutor's objection, the district court granted Streiff's motion under Minn. R.Crim. P. 15.07 to plead guilty to two lesser-included gross misdemeanor offenses. The district court found that although the state had sufficient evidence to proceed to trial, it would be a manifest injustice to have Streiff prosecuted for a felony. The court of appeals affirmed, holding that the state had failed to show an abuse of the district court's discretion. *State v. Streiff*, No. C8–02–1857, 2003 WL 1702255, at *1 (Minn.App. Apr.1, 2003). Because the collateral consequences of prosecuting Streiff on the felony charges do not constitute a manifest injustice under Rule 15.07, we reverse.

On January 5, 2002, Streiff and her husband James Streiff (James) were involved in a one-car rollover accident in Olmsted County. Witnesses reported that Streiff was on the driver's side of the vehicle, or was getting out of the driver's side, when they arrived at the scene. Witnesses found James injured and lying in a ditch near the vehicle. Witnesses reported that Streiff had wandered off from the accident scene and was found among the trees a short distance away. A preliminary breath test of Streiff taken at the scene registered a blood alcohol content of 0.162. Streiff then submitted to a blood test that indicated a blood alcohol content of 0.17.

A state trooper took a statement from James two days after the accident. James stated that he could not remember the accident, but remembered that he and his wife had been drinking prior to the accident. The trooper obtained a release for James's medical records. Based on the release, James's treating physician reported that James sustained substantial bodily harm as a result of the accident. When James discovered that his medical records had been released to the county attorney's office and were being used to prosecute his wife, he sent letters to the Minnesota State Patrol revoking all releases of medical information; the hospital revoking the medical information release; and the Assistant Dakota County Attorney, stating his opposition to the prosecution of his wife and his concern that his wife would lose her job if convicted of a felony.

After being charged with the two felonies, Streiff filed a motion under Minn. R.Crim. P. 15.07 requesting that she be allowed to plead to a lesser offense. Under Rule 15.07, a district court may accept a plea of guilty to a lesser offense if (1) "the court is satisfied following [a] hearing that the prosecutor cannot introduce evidence sufficient to justify the submission of the offense charged to the jury" or (2) "it would be a manifest injustice not to accept the plea." The district court granted the motion over the state's objection and accepted a guilty plea from Streiff to two lesser-included, gross misdemeanor charges, violations of Minn.Stat. § 609.21 subd. 2b(4) and 2b(7) (2002). The district court noted that the state had sufficient evidence to proceed to trial on the felony charges, but found that to do so would effect a "manifest injustice." The court relied on five factors: (1) James did not want Streiff to have a felony conviction; (2) Streiff's family would be harmed by the felony conviction by Streiff's possible loss of employment; (3) public policy concerns of deterrence and punishment would be met by the conviction of two gross misdemeanors; (4) the offense was an unintended consequence of an intentional act; and (5) Streiff had accepted responsibility for her actions.

A majority of the court of appeals affirmed the district court, holding that the

state failed to show an abuse of discretion by the district court. *State v. Streiff,* 2003 WL 1702255, at *1. The court stated that while the prosecutor has the final decision on what to prosecute, the court retained the authority on sentencing. *Id.* at *2. The dissenting opinion argued that the circumstances were not sufficient to show a manifest injustice, noting that this court has set a higher standard for "manifest injustice" in the comparable context of a motion to withdraw a guilty plea under Minn. R.Crim. P. 15.05. *Id.* at *3. Additionally, the dissent observed that the factors relied upon by the district court to constitute manifest injustice are factors that commonly appear in criminal cases and could not be considered under the sentencing guidelines to support a downward sentencing departure. *Id.* at *4 n. 1.

Streiff does not argue that the prosecution abused its discretion in bringing the felony charges. Neither does Streiff argue that she was selectively prosecuted for some discriminatory reason. Instead, she essentially argues that the potential loss of her employment, coupled with the objection by the victim to the felony prosecution, amount to manifest injustice. The state argues that the factors do not rise to the level of manifest injustice and that the district court's acceptance of a plea to lesser charges violates the separation of powers provision of the Minnesota Constitution.

### A. Separation of Powers [1]

A review of the history of Minn. R.Crim. P. 15.07 demonstrates the state's separation of powers concerns. Prior to 1980, Rule 15.07 did not place any conditions on the district court's discretion to accept a guilty plea to a lesser charge over the objection of the prosecutor. It simply stated "the court may accept a plea of guilty to a lesser included offense or to an offense of a lesser degree."

In 1980, we decided *State v. Carriere,* 290 N.W.2d 618, 619 (Minn.1980), which addressed the following certified question from the district court: "Under Minnesota Rules of Criminal Procedure 15.07, can the court accept a plea to an offense of lesser degree over the voiced opposition of the county attorney?" We said:

> If the second sentence of Rule 15.07 were interpreted as leaving to the trial court's complete discretion the decision whether to accept a guilty plea opposed by the prosecutor, the [separation of powers] constitutional argument the prosecutor makes in this case would have merit. We believe, however, that conditions can be placed on the trial court's acceptance of such a plea which will eliminate the danger of judicial intrusion into an area reserved for prosecutorial discretion.

*Id.* To satisfy separation of powers concerns, *Carriere* conditioned the district court's acceptance of the defendant's motion on whether the prosecutor can "demonstrate to the trial court that there is a reasonable likelihood the state can withstand a motion to dismiss the charge at the close of the state's case in chief." *Id.* We concluded that if the prosecutor can satisfy this condition, the district court "should refuse to accept the tendered guilty plea." *Id.* at 621.

In 1983, Rule 15.07 was amended to reflect the condition suggested in *Carriere,*

---

1. Article 3, § 1 of the Minnesota Constitution provides: "The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this Constitution."

but the amendment added a second condition, that the district court could also grant the defendant's motion over the prosecutor's objection when "it would be [a] manifest injustice not to accept the plea." Minn. R.Crim. P. 15.07. The phrase "manifest injustice" is not defined in Rule 15.07 and is not discussed in the comments to the rule.[2]

### B. Case Law Under Rule 15.07

In *State v. Stafford*, 340 N.W.2d 669, 670 (Minn.1983), we held that it was error for the district court to accept a plea to a lesser offense where the prosecutor's offer of proof demonstrated a reasonable likelihood that the state could withstand a motion to dismiss on the charged offense. We noted that the amended rule also allowed the acceptance of a plea based on a finding of "manifest injustice," but, without further discussion, we simply concluded that it was not a manifest injustice to charge a defendant with felony assault in the third degree for striking the victim, knocking her unconscious, and breaking her nose. 340 N.W.2d at 671 n. 2. This has been our only decision under the amended version of Rule 15.07.

In the absence of any decisions by this court on the meaning of "manifest injustice" under Rule 15.07, the court of appeals has developed a hybrid test with two parts, stating "[t]he 'manifest injustice' provision [of Minn. R.Crim. P. 15.07] more properly applies to situations like a dishonored plea bargain, or to prosecutorial decisions based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.' " *State v. Favre*, 428 N.W.2d 828, 831 (Minn.App.1988).[3]

The court of appeals has applied this interpretation of manifest injustice in eight cases. In all cases except *Neddermeyer*, where there was evidence sufficient to enforce a plea agreement, the court has held that the circumstances were insufficient to constitute a "manifest injustice." These circumstances included: (1) the charged crime was defendant's first offense and defendant had made numerous trips from Chicago to the Twin Cities to resolve the charges, *State v. Gilmartin*, 550 N.W.2d 294, 297 (Minn.App.1996); (2) the state withdrew its plea offer on the first day of trial, after the court ruled certain evidence admissible, *State v. Hoffa*, 511 N.W.2d 462, 463 (Minn.App.1994); (3) the state required the defendant to stand trial on the offense charged even though the plea would have resulted in the same punishment as a lesser offense, *Favre*, 428 N.W.2d at 830 (Minn.App.1988); (4) the district court believed that the statute was unconstitutionally vague and discriminatorily applied, *State v. McAllister*, 399 N.W.2d 685, 688–690 (Minn.App.1987); (5) the district court accepted the defendant's statement that he had paid the fine for which his license had been suspended before being stopped for a driving after sus-

---

2. The files of the court's criminal rules committee do not reflect any discussion of why the "manifest injustice" language was included. The files do contain comments submitted by the state attorney general and several county attorneys, objecting to the manifest injustice language and noting the possible separation of powers issues that could arise under it.

3. The first part of the test was apparently based on *State v. Neddermeyer*, No. C0–87– 1415, 1987 WL 26901, at *2 (Minn.App. Dec.15, 1987) (unpublished opinion), where the court held that the district court did not abuse its discretion by allowing the defendant to plead to a lesser offense when the court found that a plea bargain had been offered and accepted prior to the hearing. The second part of the test was drawn from *Wayte v. U.S.*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), where the Court addresses issues of selective prosecution.

pension violation and the delay in processing his payment was the cause of his not having a license, *State v. Whitley*, No. C4–99–726, 1999 WL 809776 at *1 (Minn.App. Oct.12, 1999) (unpublished opinion); and (6) the defendant would suffer the same consequences under the lesser offense, he was using a legally obtained drug that impaired his driving, and the defendant had displayed good behavior for two years, *State v. Heibel*, No. C6–94–2295, 1995 WL 81395 at *2 (Minn.App. Feb.28, 1995) (unpublished opinion).

### C.   Case Law in Related Areas

The parties support their respective interpretations of Rule 15.07 by referring to our decisions concerning the division of power between the prosecutor and the court at other stages in the prosecution of a crime. The prosecution of a criminal defendant may move through several potential stages, from a complaint issued by the prosecutor or an indictment returned by a grand jury; to plea negotiations; to the entry of a plea; to the ordering of a stay of adjudication or a stay of imposition or of execution of a sentence; to the execution of a sentence. At one end of this spectrum, bringing charges and plea bargaining, the discretion rests almost entirely with the prosecutor. At the other end of the spectrum, the imposition of the sentence or staying the imposition or execution of a sentence, the discretion rests almost entirely with the court. But the separation of powers is perhaps not as clear for the stages that lie in between.

#### 1.   Stay of Adjudication

Streiff relies on two cases involving stays of adjudication to support her view that the district court had the authority to accept her plea to the lesser charges, *State v. Krotzer*, 548 N.W.2d 252 (Minn.1996) and *State v. Olson*, 325 N.W.2d 13 (Minn.

1982). Preliminarily, we note that because the act of the court in accepting a plea over the objection of the prosecutor is more intrusive of the prosecutor's charging function than ordering a stay of adjudication, the restriction on the court's authority to accept a plea to a lesser charge would logically be greater than that on the court's authority to order a stay of adjudication.

In *Krotzer*, this court held that the district court had the inherent power to stay adjudication where special circumstances so indicate. 548 N.W.2d at 255. Krotzer was a 19–year–old boy who was charged with statutory rape for having consensual sex with his 14–year–old girlfriend. *Id.* at 253. Krotzer entered a guilty plea to the prosecutor's charge but requested the court to stay adjudication of his crime. The Department of Corrections, remarking on the lack of aggression in Krotzer's history and the inappropriateness of requiring him to register as a sex offender, recommended that he be placed on probation under a stay of adjudication. The victim's mother agreed. The district court postponed acceptance of the guilty plea and, over the objection of the prosecutor, stayed adjudication and placed Krotzer on probation for 60 months. This court held that the district court had inherent power to stay the adjudication in the "furtherance of justice." *Id.* at 254–55.

In *Olson*, after the defendant had pleaded guilty to assaulting his wife with a dangerous weapon, the district court stayed the 54–month prison sentence for 10 years. 325 N.W.2d at 16. The district court described "strong mitigating factors," including the wife's belief that the defendant was a "good man" and no danger to her, the wife was not seriously hurt (although struck on the arm by a bullet), and the probable loss of the family home and the inability of the children to continue

to attend "educational programs beyond high school" if the defendant was incarcerated. *Id.* This court held that the district court had the authority to stay the prison term over the prosecutor's objection. *Id.*

But *Krotzer* and *Olson* are not particularly helpful to Streiff because in each case, the district court's action took place during the sentencing stage and did not involve a direct intrusion on the charging or plea-bargaining functions of the prosecution. In fact, *Krotzer* recognized that the court's authority to interfere with the charging function of a prosecutor is much less than its authority in sentencing, stating:

> Under established separation of power rules, absent evidence of selective or discriminatory prosecutorial intent, or an abuse of prosecutorial discretion, the judiciary is powerless to interfere with the prosecutor's charging authority.

548 N.W.2d at 254 (citations omitted). Moreover, Streiff fails to recognize that this court restricted the holding in *Krotzer* when it later confirmed that the district court may stay adjudication only where "special circumstances" are present. *State v. Foss*, 556 N.W.2d 540 (Minn.1996). This court emphasized in *Foss* that a stay of adjudication should only be used "*sparingly*" and only for "the purpose of avoiding an injustice resulting from the prosecutor's *clear abuse of discretion* in the exercise of the charging function." *Id.* at 541 (emphasis in original). Thus, *Foss* is even less favorable for Streiff because it recognizes that separation of powers affects not only the authority of the court to directly interfere with the charging function, but also

limits the court's authority to indirectly interfere through sentencing.

Even more damaging to Streiff's argument is the decision of this court that followed *Foss*. In *State v. Twiss*, 570 N.W.2d 487 (Minn.1997), this court reversed the district court's stay of adjudication of the defendant's guilty plea, which had been granted over the objection of the prosecutor based on the possibility that the defendant might lose her job if convicted of a gross misdemeanor. We said that the possible loss of a job is not a "special circumstance" under *Foss*. "Rather, it is the sort of consequence that commonly attends a conviction of a serious offense, such as the offense in this case." *Id.*[4]

Thus, Streiff's reliance on the stay of adjudication analogy does not support her argument. If the factors relied upon to grant Streiff's Rule 15.07 motion are not special circumstances that would support a court's indirect interference with the charging function through a stay of adjudication, they provide even less support for the court's more direct interference by accepting a plea to a lesser charge.

## 2. Dismissal under Minn.Stat. § 631.21

Streiff argues that because the court had the power to dismiss the charges on its own motion under Minn.Stat. § 631.21 (2002), it had the implied authority to take the less severe measure of accepting a plea to a lesser charge. Section 631.21 provides: "The court may order a criminal action, whether prosecuted upon indictment or complaint, to be dismissed. The

---

4. In *State v. Leming*, 617 N.W.2d 587 (Minn. App.2000), the court of appeals addressed several other factors relied upon by the district court in ordering a stay of adjudication and found them all to fall short of the "special circumstances" test. Similar to the factors relied upon by the district court here, these

included (1) the possibility of the loss of employment; (2) the inability of the defendant to pay restitution if she lost her job; (3) the victim's agreement to the stay; (4) the defendant's lack of a criminal record; and (5) the defendant's remorse. *Id.* at 589–90.

court may order dismissal of an action either on its own motion or upon motion of the prosecuting attorney and in furtherance of justice."

But this argument merely begs the question of what the scope of the authority of the court really is under section 631.21. First, such a dismissal ordinarily would not have the effect of precluding the prosecutor from recharging the accused. In *Krotzer,* we said: "While dismissing the complaint under section 631.21 might have avoided the need for a stay of adjudication, the prosecutor would have been free to reinstate identical criminal charges against Krotzer." 548 N.W.2d at 255. *See also City of St. Paul v. Halvorson,* 301 Minn. 48, 52, 221 N.W.2d 535, 537–38 (1974) (stating that dismissal under section 631.21 is not appealable, but it is not "with prejudice," leaving the prosecutor free to file a new complaint); 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice–Criminal Law and Procedure* § 11.19 (3d ed.2001). Thus, dismissal of a charge under the statute would actually be less intrusive of the prosecutor's charging function because it would be without prejudice to the reinstatement of charges.

Second, to the extent that it was argued that such a dismissal might preclude further charges, the statute would raise the same separation of powers issues that were present in *Carriere* and led the court to imply restrictions on the authority of the court to interfere with the prosecutor's charging function.

### 3. Withdrawal of a Guilty Plea

The state relies in part on the analogy to the high standard for "manifest injustice" established by this court, under Minn. R.Crim. P. 15.05, to allow the withdrawal of a guilty plea. We have applied an "abuse of prosecutorial discretion" standard to define "manifest injustice" under

Rule 15.05 and have confirmed that collateral consequences of a plea, including loss of employment, do not support a finding of abuse of prosecutorial discretion. *See Kaiser v. State,* 641 N.W.2d 900 (Minn. 2002) (requirement to register as a predatory offender); *Alanis v. State,* 583 N.W.2d 573 (Minn.1998) (deportation); *Barragan v. State,* 583 N.W.2d 571 (Minn. 1998) (deportation); *Kim v. State,* 434 N.W.2d 263 (Minn.1989) (loss of employment). Because allowing the withdrawal of a plea is less intrusive of the prosecutor's discretion than accepting a lesser plea (after withdrawal, the original charge still stands), the restriction on the authority of the court to accept a plea to a lesser offense should be at least as great as that on the court's authority to allow a defendant to withdraw a guilty plea. Thus, "manifest injustice" under Rule 15.07 should not be interpreted any more broadly than manifest injustice under Rule 15.05—as the abuse of prosecutorial discretion.

### 4. Sentencing Departures

The state relies in part on the analogy to the Minnesota Sentencing Guidelines to argue that factors that do not justify a downward departure under the guidelines should not be considered sufficient to supply manifest injustice under Rule 15.07. Circumstances involving employment or family status are specifically excluded from consideration in making a downward departure in sentencing. Minnesota Sentencing Guidelines II.D.1. If such factors do not support a sentencing departure, which only indirectly interferes with the prosecutor's charging function, they should likewise provide no support for the acceptance of a plea to a lesser charge, which directly interferes with the charging function.

■ We conclude that the standard of proof required to establish a "manifest injustice" under Rule 15.07 is at least as high as that required under Rule 15.05, which necessitates a showing of abuse of prosecutorial discretion. We hold that the factors relied upon by the district court here do not establish an abuse of prosecutorial discretion.

Reversed and remanded.

ANDERSON, PAUL H., Justice (concurring).

> It is easy to do justice, but it is much harder to do right.
>
> Sir Robert Morton
>
> Barrister and M.P.
>
> "The Winslow Boy" [1]

I join in the court's opinion. Under the laws of the State of Minnesota, our rules, and the separation of powers doctrine, it is not a "manifest injustice" for the state to have charged Kathryn Lorraine Streiff with a felony for her alleged misconduct. Nevertheless, I write separately to add some comments on the concepts of justice, injustice, and punishment. This case demonstrates how difficult it is to establish the line separating the executive branch's power to charge a criminal offense from the judiciary's authority to supercede that power. Moreover, our holding illustrates that the executive branch's power to charge a criminal offense is awesome and sometimes may be difficult to exercise in a just manner. The facts of this case and our holding provide the opportunity for me to explore the issue of whether it is sufficient for the state to see that "justice shall be done" [2] or whether the state also has an additional obligation to ascertain that the right thing is done.

I begin by addressing our use of the term "manifest" to modify the word "injustice" in Minn. R.Crim. P. 15.07. Much of our difficulty in interpreting this rule stems from the use of the term "manifest." It is a word that "often functions in suspect ways in legal writing." [3] I agree with Garner that it "is one of those vague terms by which lawyers 'create an appearance of continuity, uniformity and definiteness (that does) not in fact exist.' " [4]

If everyone's definition of injustice was uniform, there would be no need to modify its use in Rule 15.07. But this is not the case. The definition of injustice often varies with the individual doing the defining. As Justice Oliver Wendell Holmes stated to a young aide shortly after he declined a request for a writ of habeas corpus in the *Sacco–Vanzetti* case:

> "The primary responsibility of prosecution is to see that justice is accomplished." Nat'l Dist. Attorneys Ass'n, *National Prosecution Standards* (2d ed.1991).
> "The duty of the prosecutor is to seek justice, not merely to convict." ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3–1.2 (3d ed.1993).

---

1. "The Winslow Boy" (Sony Pictures Classics 1999).

2. The United States Supreme Court has stated that a government lawyer
   is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, *but that justice shall be done.*
   *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (emphasis added).

3. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 547 (2d ed.1995).

4. *Id.*

Don't be foolish, boy. We practice law, not "justice." There is no such thing as objective "justice," which is a subjective matter. A man might feel justified in stealing a loaf of bread to fill his belly; the baker might think it most just for the thief's hand to be chopped off, as in Victor Hugo's *Les Miserables. The image of justice changes with the beholder's viewpoint, prejudice or social affiliation.* But for society to function, the set of rules agreed on by the body politic must be observed-the law must be carried out.

Lira Baker, *The Justice From Beacon Hill: The Life and Times of Oliver Wendell Holmes* 608 (Harper Collins 1991) (emphasis added.) More recently and closer to home, former Anoka County Attorney Robert W. Johnson made the following observation about justice: "Now justice, you can play around with that word a lot. What's justice to one person is not justice to another person."[5]

Because the definition of injustice can vary based on the beholder's viewpoint, the law requires a term that is more precise. This is especially true in the case of Rule 15.07 which operates in the realm of the delicate balance of power between the executive and judicial branches of government. The rule attempts to achieve this precision by modifying "injustice" with the word "manifest."

As used in Rule 15.07, "manifest" serves a useful purpose. It significantly narrows the circumstances under which a court can, over the state's objection, accept a defendant's plea to a less serious offense than the one charged by the state. For a court to exercise its discretion to accept a plea to a lesser offense over the state's objection, the injustice must be so obvious and extreme that it exceeds the bounds of what is a reasonable exercise of the state's power to charge an individual with a particular crime. To constitute a manifest injustice, the state's action must approach conduct that, when a recitation of the facts is given to an average citizen, the citizen is inclined to exclaim "that's outrageous."

With the foregoing understanding of Rule 15.07 in mind, I next explore what constitutes a just punishment. Punishment has always been part of the human retribution system. Justice requires that wrongdoers be subject to punishment. A wrongdoer must be subject to punishment because we are a society governed by the rule of law, and it is the rule of law that permits us to function as a civil society. All citizens receive benefits from participating in a civil society. We are able to live by rules that are more or less fixed, thus enabling us to ascertain in advance how others will behave and to have a reasonable assurance that all will receive like treatment. But, in return for these benefits, citizens of a civil society must accept the responsibility and burden of exercising certain restraints on individual behavior. In a civil society, when citizens obey the law, there is a moral equilibrium, but when the law is disobeyed, this equilibrium is disrupted.

When a person disobeys the law, she becomes a wrongdoer who may receive an unjust double benefit. Not only does she benefit from others obeying the law, but she also may receive the physical, psychic, and/or economic benefits derived from her criminal conduct. Punishment as a consequence of misconduct is necessary for a civil society to maintain and restore its moral equilibrium. Through punishment,

---

5.   Robert W. Johnson, Attorney at Law and former Anoka County Attorney, "The Role of the County Attorney: Ministers of Justice,"

2002 Minnesota County Attorneys Annual Meeting, November 21, 2002.

the wrongdoer repays her debt to society and then, after repaying that debt, rejoins society and does so on a full and equal footing with those who have obeyed the law. A failure to punish appropriately may even be a sign of disrespect for the wrongdoer, for when there is a serious transgression against society, too little punishment can result in injustice. By imposing the appropriate punishment, society shows respect for the wrongdoer's interests and demonstrates the belief that the wrongdoer has the capacity of an autonomous person who was bad—not sick—and is capable of being restored as a citizen of society. Thus, there exists a sound and rational basis to appropriately punish a wrongdoer.

This obvious conclusion brings me to my next question, which has a less obvious answer. What role, if any, do mercy and compassion play when ascertaining the just punishment for a particular crime? Some people exclusively emphasize retribution as the basis for punishment and argue that in a just system, there is little room for the sentimentality associated with mercy and compassion. They argue that, while mercy is a moral virtue, there is a danger that it can and will be overvalued in the justice system. They assert that anger and retribution toward the wrongdoer are natural, while mercy is an improper response to the wrongdoer's insulting message to society. This approach can manifest itself when prosecutors, without exception, follow a policy of always charging and pursuing the most serious, readily provable offense or offenses supported by the facts of a case. Judges frequently see this attitude expressed in court, especially when the time comes to exercise sentencing authority. On a daily basis, judges face the question whether it is inappropriate, even presumptive, for them to ignore or condemn attitudes that focus exclusively on anger and retribution. Should these attitudes trump any thought of mercy? Should a judge be permitted to nurture a heightened awareness that such attitudes can blind the court to circumstances that make the wrongdoer's actions more pathetic than evil?

It is my contention that a legal system must provide room for the qualities of mercy and compassion as elements in any equation that seeks justice as its end result. Moreover, these qualities should exist at all stages of the system—with the police, prosecutors, and the courts. Without mercy and compassion, a legal system cannot be truly just. This view is neither novel nor foreign to our justice system. For example, 80 years ago, Justice Benjamin Cardozo wrote "Perhaps we shall even find at times that when talking about justice, the quality we have in mind is charity." [6]

But when are mercy and compassion appropriate? This question can present a dilemma for judges, and I assume the same is true for the police and prosecutors. A dilemma exists because justice, mercy, and compassion are so different. Mercy and compassion are gifts that can be bestowed. They are not rights to which a wrongdoer is entitled. Shakespeare said it well in the *Merchant of Venice* when he wrote:

The quality of mercy is not strained,

It droppeth as the gentle rain from heaven

Upon the plain beneath: it is twice blessed;

---

6. Fred R. Shapiro, *The Oxford Dictionary of American Legal Quotations* 231 (Oxford University Press 1993).

It blesseth him that gives and him that takes:

'Tis mightiest in the mightiest: it becomes

The throned monarch better than his crown.[7]

Is it wise for us to have a system that permits mercy to season justice? Should the people grant to government officials the power to act mercifully? Does the general welfare and common good—the commonweal—require that mercy be part of the justice system? I submit that we want a system that allows for both justice and mercy; otherwise, we become a society that is rigid, unduly strict, unbending, and myopic in its pursuit of justice. Justice must always be our primary goal, but where circumstances demand, true justice requires that we have the discretion to act in a merciful manner. Having the power to act mercifully enables a person to do the right thing. Thus, a civil society must make room for mercy, must want it, must ask for it, and indeed in some cases must demand it.

So where does the foregoing discussion take me with respect to the case at hand? As our court's opinion points out, under Minnesota law, it was not a manifest injustice for the state to charge Marilyn Streiff with a felony for her alleged misconduct. Manifest injustice does not exist here because the felony charge does not result in an obvious injustice that exceeds the bounds of what is a reasonable exercise of the state's power to charge. Under our separation of powers doctrine, it was the district court, not the state, that overstepped its bounds.

Perhaps the district court acted as it did in an effort to do the right thing and, in doing so, season justice by bestowing mercy. As the court stated, (1) Streiff's husband, who was also the victim of her criminal conduct, did not want her to have a felony conviction; (2) Streiff's family would be unduly harmed by a felony conviction because she would lose her job; (3) public policy concerns of deterrence and punishment would be met by two gross misdemeanor convictions; (4) the offense was an unintended consequence of an intentional act; and (5) Streiff accepted full responsibility for her actions. The court may have acted as it did to prevent Mr. Streiff from being twice a victim, first by his wife and second by the justice system. Even if the court believed that it should do the right thing and act to prevent an injustice, it could not do so because the state's action did not reach the limits of what we view to be a manifest injustice. Therefore, there is little doubt that under the law we are doing the right thing by reversing the district court's decision.

Our conclusion that the state acted within its authority under the law still leaves a question that is not for us to answer—it is one upon which I can only ponder. Has the state not only sought to see that "justice shall be done," but, when doing so, has it done the right thing? I have no doubt that the state believes it has acted in a manner consistent with its legal mandate and is doing justice. Whether it has done the right thing is another question. In "The Winslow Boy," defense attorney and member of Parliament Sir Robert Morton successfully defended the Winslow boy against false charges at great sacrifice to the family's status, health, and wealth. At the end of the movie, Sir Robert said, "Right has been done." But then he added, "It is easy to do justice, but it is much

---

7. Elizabeth M. Knowles, *The Oxford Dictionary of Quotations* 688 (5th ed. Oxford University Press 1999).

harder to do right." Under the circumstances of this case, our justice system leaves it to the state to determine what is the right thing to do. I trust that the state will fulfill its role as a minister of justice, will address this hard question, and then exercise its discretion by doing what is right.